**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

KIMALYN ROMONA CARAWAY, individually and
as next of kin of DARIUS DAWON CARAWAY,
and the Estate of DARIUS DAWON CARAWAY,

**Plaintiffs,**

v.                                             No.:      **1:22-cv-1150-STA-jay**

CORECIVIC OF TENNESSEE, LLC,
CORECIVIC, INC.,
DAMON HINIGER,
STEVE CONRY, and
VINCE VANTELL,

**Defendants.**

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

Plaintiff Kimalyn Ramona Caraway filed this action individually and as next of kin of Darious Dawon Caraway ("the Decedent") and on behalf of the Estate of Darius Dawon Caraway against CoreCivic of Tennessee, LLC, CoreCivic, Inc., Damon Hininger, Steve Conry, and Vince Vantell. Plaintiff alleges that Defendants violated the civil rights of the Decedent under the Eighth and Fourteenth Amendments to the United States Constitution. [1] Plaintiff brings her claims pursuant to 42 U.S.C. § 1983, and she has also brought a supplemental state law claim of negligence.

---

[1] Because the Decedent was an inmate at the time of death, as opposed to a pre-trial detainee, the Eighth Amendment rather than the Fourteenth Amendment applies to Plaintiff's claims. *See Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018).

Defendants previously filed a motion to dismiss which was denied without prejudice (ECF No. 21) in light of Plaintiff's amended complaint.  (ECF No. 18.)  On January 19, 2023, Defendants filed a second motion to dismiss.  (ECF No. 22.)  Plaintiff has filed a response to the motion (ECF No. 24), and Defendants have filed a reply to the response.  (ECF No. 27.)  For the reasons set forth below, the motion to dismiss is **GRANTED**.

<u>Standard of Review</u>

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).  Under *Twombly* and *Iqbal*, Rule 8(a)'s liberal "notice pleading" standard requires a complaint to contain more than a recitation of bare legal conclusions or the elements of a cause of action. Instead, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

<u>Background</u>

The complaint alleges as follows. Defendant CoreCivic owns, operates, and maintains a system of private prisons throughout the country with several private prisons in the State of Tennessee, including Whiteville Correctional Facility ("WCF"). (Amd. Cmplt, para. 6, ECF No. 18.) CoreCivic has statutory authority to operate private prisons in the State of Tennessee under the Private Prison Contracting Act of 1986, Tenn. Code Ann. §§ 41-24-101 through 41-24-119, and acted under the color of state law and in compliance with the laws of the State of Tennessee. (*Id.* at paras. 7, 8, 10.) CoreCivic's operation of WCF is not in compliance with the laws of the State of Tennessee nor is it in compliance with the contractual terms which it negotiated with the State of Tennessee. (*Id.* at para. 11.)

WCF is owned, operated, and maintained by CoreCivic. Defendants made decisions regarding the day to day operations of the WCF, including but not limited to issues regarding the staffing of the WCF. (*Id.* at para. 19.)

The Decedent was born on December 17, 1992, and Plaintiff was his mother. (*Id.* at para. 12.) In April 2021, the Decedent was transferred to WCF in order to serve the remainder of his prison sentence.

On July 15, 2021, the Decedent was found unresponsive at approximately 2:45 a.m. in his cell at WCF. (*Id.* at para. 24.) He was pronounced dead on July 15, 2021, at 4:08 a.m. at Bolivar General Hospital. (*Id.* at para. 25.) The apparent cause of death was a drug overdose, *i.e.*, "Para-Flourofentanyl Toxicity." (*Id.* at para. 14.)  This cause of death was confirmed by an autopsy. (*Id.* at para. 26.) At the time of his death, the Decedent was under the care, custody, and control of Defendants (*id.* at para. 13), thus making Defendants completely responsible for his physical well-being. (*Id.* at para. 32.)

ParaFlourofentanyl Toxicity can only be caused by the ingestion of illegal contraband. (*Id.* at para. 33.) Defendants are charged with controlling all materials that pass through the gates of their privately owned and operated prison. As such, Defendants should not have allowed the illegal contraband which caused the death of the Decedent to enter the confines of the private prison or to go into the hands of the Decedent. (*Id.* at para. 34.) Further, Defendants are charged with conducting routine head counts and inspection of the inmates in order to make periodic and routine checks on the safety and wellbeing of the inmates they are safeguarding. (*Id.* at para. 35.) Defendants failed to make such periodic head counts.(*Id.* at para. 36.)

Defendants' failure to properly staff the WCF directly led to illegal contraband, such as that that killed the Decedent, to enter into the facility. This lack of staffing directly led to the failure to properly search individuals who were entering the facility and to properly search and inspect the cells of inmates, leading to the proliferation of illegal contraband in the correctional facility. This lack of staffing also directly led to Defendants' failure to properly police the inmates in the cells or conduct routine and industry standard head counts of the inmates. This directly led to illegal drug use on the part of the inmates in the correctional facility. This lack of staffing directly led to Defendants being unable to timely and properly respond to drug overdoses which were occurring in the correctional facility. (*Id.* at para. 37.)

Defendants had knowledge of illegal contraband entering the facility. (*Id.* at para. 38.) Defendants had knowledge of inmates overdosing on illegal contraband entering the facility. (*Id.* at para. 39.) Defendants had knowledge that the use of illegal contraband, such as fentanyl, was highly likely to lead to overdoses and eventual deaths in the correctional facility. (*Id.* at para. 40.) Defendants had knowledge that the death rate in their correctional facilities exceeded the death rate in other correctional facilities not run by CoreCivic. (*Id.* at para. 41.)

4

Defendants had knowledge that the WCF was understaffed, especially in regard to approved correctional officer staff. (*Id.* at para. 42.) In 2017 and 2020 audits, it was found that WCF was operating with fewer than the approved correctional officer staff. (*Id.* at paras. 43, 44.) The 2020 audit found that "low staffing coupled with frequent overtime impacted management's ability to provide safe and secure facilities, especially in emergencies" and that CoreCivic failed to properly report deaths in the private prisons, failed to perform mandatory procedures designed to protect and save inmates, and failed to classify deaths as drug overdoses; the audit also found that twenty-six correctional officer positions were vacant at WCF and that seventy-four overall positions were vacant. (*Id.* at paras. 45, 46 47, 48, 50.) Even with such knowledge, Defendants failed to take any measures to stop or otherwise curtail the influx of illegal contraband into the correctional facility. (*Id.* at para. 51.)

In order to properly address this influx of illegal contraband into the facility, Defendants would have to properly staff the correctional facility and expends fund to do so. (*Id.* at para. 52.) Defendants' focus on corporate profit over the safety of the inmates demonstrates a reckless disregard and deliberate indifference for the human lives they are charged with safeguarding. (*Id.* at para. 53.)

Defendants did not conduct walk through inspection of the inmates on a timely basis. This failure to conduct regular inspections of the inmates resulted in the Decedent's overdose not being discovered in a timely manner, which resulted in his death. (*Id.* at para. 55.) Defendants, by and through their deliberate policies and procedures and the actions of their employees complying with said policies and procedures, were responsible for the illegal contraband entering WCF. (*Id.* at para. 56.) One of the primary reasons that illegal contraband enters the privately run prison is because Defendants purposely understaff the prison. They willfully understaffed WCF because doing so

was and remains more profitable. (*Id.* at para. 56.) Such severe understaffing is insufficient to prevent serious injury when inmates use illegal drugs and/or overdose. It was reasonably foreseeable that the failure to prevent the illegal contraband from entering the facility would result in drug overdoses and overdose deaths. (*Id.* at para. 57.) CoreCivic had actual knowledge that WCF was severely understaffed. WCF was understaffed deliberately because paying for sufficient staffing is expensive and understaffing is more profitable. (*Id.* at para. 58.)

Defendants Hininger, Conry, and Vantell had actual knowledge of WCF's chronic understaffing; the presence of illegal contraband; inmates' using such illegal contraband; the death rate at WCF and other CoreCivic private prisons' being higher than the industry average; that one of the causes of the higher death rate was overdoses caused by inmate use of illegal contraband; and that properly staffing the WCF and other CoreCivic private prisons would decrease the death rate of the inmates. Despite this knowledge, they willfully failed to remedy CoreCivic's deliberate indifference to inmate safety, both because understaffing is more profitable and because they do not care when inmates in CoreCivic's care needlessly die. (*Id.* at paras. 62, 63, 64.)

There have been at least two other recent lawsuits involving inmate deaths at CoreCivic facilities due to understaffing issues. *See Newby v. CoreCivic of Tennessee, LLC* (No. 3:22-cv-00093) (M.D. Tenn.), and *Williams et al v. CoreCivic, Inc. et al* (No. 3:22-cv-00571) (M.D. Tenn.) (*Id.* at para. 65.) The incident involving the Decedent is part of a pattern. In the years preceding the events in this lawsuit, CoreCivic paid millions in settlements around the United States because (1) it routinely understaffed its correctional facilities, inevitably resulting in anarchy, assault, murder, and suicide; and (2) it routinely failed to provide adequate medical and mental health care to inmates. (*Id.* at para. 66.)

CoreCivic, its wardens, its senior officers, and its directors adopted and enforced a corporate policy of deliberate indifference to inmate health and safety. (*Id.* at para. 75.) The directors and senior officers of CoreCivic knew that inadequate supervision, inadequate medical care, inadequate training, and improper inmate segregation practices were rampant at CoreCivic's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety. (*Id.* at para. 76.)

Defendant Damon Hininger is the CEO of CoreCivic and does not work at WCF. (*Id.* at para. 5.) Defendant Steve Conry is the VP of Operations at CoreCivic and likewise does not work at WCF. (*Id.* at para. 6.)  At the time of the Decedent's transfer to WCF, Defendant Vantell was the Warden of the facility and remained in that position at all relevant times. (*Id.* at para. 20.) Defendant Vantell is the only individual defendant who worked at WCF at the time of Decedent's death. (*Id.* at para. 7.)

<u>Analysis</u>

<u>Section 1983</u>

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."  42 U.S.C. § 1983.  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).  "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).

Generally, local governments are not considered to be "persons" under § 1983 and, thus, are not subject to suit. *Monell v. N.Y.C. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). The Sixth Circuit has applied the standards for assessing municipal liability to claims against private corporations that operate prisons. *See Thomas v. Coble*, 55 F. App'x 748, 748 (6th Cir. 2003) ("A private corporation that performs the traditional state function of operating a prison acts under the color of state law for purposes of § 1983.") When "execution of a government's [or private prison's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury[,]" municipalities and other local governments [or private prisons] are considered a "person" for purposes of § 1983. *Bd. Of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*).

Accordingly, § 1983 liability does not attach to a private prison based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability is imposed on the basis of the prison's own customs or policy. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (stating that, although a private corporation that operates a prison acts under the color of state law for purposes of § 1983, a plaintiff may not sue such a corporation solely on the basis of respondeat superior liability); *see also D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (reiterating that, under § 1983, entities are responsible only for their own illegal acts and may not be held vicariously liable for the actions of their employees (relying on *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)). Thus, plaintiffs who seek to impose liability on private prisons under § 1983 must prove that an action pursuant to an official policy or custom caused their injury.

Official policy includes the decisions or the acts of its policymaking officials. *Pembaur v. Cincinnati*, 475 U.S. 469, 480 – 481 (1986); *see also Bryan Cnty.*, 520 U.S. at 403-04 (explaining

that "official policies" are "decisions of … those officials whose acts may fairly be said to be those of the" entity itself).  Alternatively, a "custom" is a practice that, while not formally approved, "may fairly subject a [private prison] to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404.  Such a custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'"  *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir.1996) (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).

Absent proof of an unconstitutional policy, a private prison is not liable for a single incident resulting in a constitutional violation.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985).  Furthermore, a private prison is not liable unless there is an "affirmative link between the policy and the particular constitutional violation alleged" or "causal connection." *Id.*  Thus, to establish liability under § 1983, Plaintiff "must adequately plead (1) that a violation of a federal right took place; (2) that the defendant acted under color of state law; and (3) that the private prison's policy or custom caused that violation to happen." *Bright v. Gallia Cnty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)).  *See also Price v. Bailey*, 2009 WL 198962 at *2 (W.D. Mich. Jan. 26, 2009) (explaining that the plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy).

Here, Plaintiff has adequately pled that that the rights of the Decedent under the Eighth Amendment were violated by Defendants under color of state law.  However, Defendants contend that Plaintiff has not pled sufficient facts to show that CoreCivil adopted a policy and/or custom of deliberately understaffing WCF in such a way that would lead to unconstitutional results and

has not pled sufficient facts to support a claim that any of the individual defendants had any personal involvement in the Decedent's death.

The Eighth Amendment prohibits cruel and unusual punishment and requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In order to establish an Eighth Amendment claim for deliberate indifference to an inmate's safety, the inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Id.* at 834. Thus, a plaintiff must demonstrate that "(1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citations omitted).[2]

Although Plaintiff has alleged that the policies, customs, and procedures of CoreCivic were the moving force behind the Decedent's death, it is not enough for a complaint to contain conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings to support the allegations. *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient to state a claim under § 1983. *Twombly*, 550 U.S. at 555-56 n.3.

In the present case, Plaintiff's allegations against CoreCivic are that it has adopted a policy of understaffing at all of its facilities, including WCF, and that this understaffing, including the

---

2 It is undisputed that the alleged deprivation in this case, *i.e.*, the death of the Decedent, was "objectively serious."

lack of adequate head counts and timely walk throughs of the cells, led to an influx of illegal drugs which resulted in the death of the Decedent. However, as noted by Defendants, Plaintiff does not allege when WCF was understaffed, how it was understaffed, what posts were understaffed, or how understaffing led to the drugs entering WCF. And, she does not make any factual assertions as to which walk through was missed, which head count was missed, who was charged with conducting the walk throughs and head counts, or how any alleged missed walk through or head count contributed to Decedent's death.

The extent of any "factual" assertions is Plaintiff's reliance on two audits that were conducted prior to the Decedent's incarceration at WCF – a 2017 audit found that WCF was operating with "fewer than the approved correctional officer staff" and a 2020 audit found that WCF had twenty-six vacant correctional officer positions and seventy-five overall vacant positions. (ECF Nos. 18-3, 18-4.) However, as Defendants point out, Plaintiff does not allege that this understaffing led to any specific inmate deaths, led to an increase in the introduction of illegal contraband into WCF, or otherwise led to any WCF inmate suffering a constitutional deprivation.[3]

The necessity for pleading specific facts was recently discussed in *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), a case factually similar to the present one. *Zakora* involved a § 1983 action against officials and employees of Michigan Department of Corrections ("MDOC") and Michigan State Police ("MSP"). The complaint alleged that the defendants were responsible for an inmate's death from an overdose of fentanyl because (1) they failed to protect him from the allegedly rampant problem of drug smuggling at the facility and (2) they failed to promptly

---

[3] Defendants also point out that the 2020 audit noted that there were five drug overdose deaths at non-CoreCivic facilities that were incorrectly classified as natural deaths but made no such finding related to CoreCivic facilities, and the audit discussed drug screen reporting without addressing the amount of drug use in any specific facility.  The November 2017 audit addressed staffing at WCF but did not address drug use.

investigate two other incidents of drug overdoses in the inmate's unit that occurred within two days of his own death in violation of the inmate's Eighth Amendment rights. The complaint also alleged that two corrections officers were deliberately indifferent to the inmate's serious medical needs by not heeding warnings from other inmates about the inmate's health status immediately before he died. *Id.* at 460.

The Court summarized the following facts from the amended complaint.

On the morning of January 22, 2017, Zakora was found lying unresponsive in his bunk in the C-Unit of Lakeland by defendant Steven Johnson, a corrections officer at the facility. Responding officers determined that Zakora was already dead due to the presence of rigor mortis, and the cause of death was later found to be accidental fentanyl toxicity. Earlier that morning, another prisoner allegedly told Johnson and/or defendant Chadwick Mobley (another corrections officer at Lakeland) to "check on Mr. Zakora because he was not doing well or because there appeared to be something wrong with him." The complaint alleges that these warnings went unheeded, and that Zakora was never checked on, foreclosing the possibility of any lifesaving medical treatment.

Mobley worked the night shift in Zakora's housing unit from 10:00 p.m. on January 21 until 6:00 a.m. the next morning, at which time Johnson's shift started. Both Johnson and Mobley stated in unrebutted affidavits that they had no knowledge either before or during the night shift that Zakora possessed, ingested, or intended to ingest illegal drugs. Mobley stated that he did not speak with Zakora during that shift, and no one advised him to check on Zakora or to watch Zakora closely. According to Johnson's affidavit, he discovered Zakora dead in his bunk on January 22 at 7:58 a.m., only seconds after a prisoner who was exiting the unit said that Zakora was not "doing too good" or "words to that effect." Johnson also asserts that no one advised him that he should check on Zakora or watch him closely prior to that time.

The C-Unit of Lakeland is a single enclosure that houses between 12 to 16 prisoners. Two other prisoners in the C-Unit were hospitalized from drug overdoses in the two days prior to Zakora's death, but no immediate investigation was undertaken. After Zakora's death, the MSP brought a drug-detection dog into the facility. The dog's alerts gave positive indications of contraband in the C-Unit.

Zakora's overdose, according to the complaint, was the consequence of a longstanding problem of drug smuggling into Lakeland and other Michigan state prisons. At the time of Zakora's death, illegal drugs were allegedly being smuggled into Lakeland in basketballs that were thrown over the facility's fence. This scheme

12

was allegedly orchestrated by defendant Jane Doe — an unidentified female corrections officer — and a prisoner with whom she was romantically involved.

According to the complaint, an unidentified prisoner had informed defendant Troy Chrisman, an inspector at Lakeland, about the drug-smuggling ring "on more than one occasion prior to Zakora's death, ... provid[ing] information to the officers with details of how the drugs were coming in and who was providing them." Chrisman allegedly relayed this information to another inspector at Lakeland, defendant Matthew Huntley, but neither took any action nor undertook any investigation. This information was then allegedly passed on by Chrisman and Huntley to their supervisors, defendant Bonita Hoffner (the Warden at Lakeland) and defendant Steve Rivard (the Assistant Deputy Director of the MDOC), but they allegedly either ignored the information or instructed Chrisman and Huntley to not investigate the accusations. Defendant Russell Rurka (the Administrative Assistant to the Warden of Lakeland) and defendant Heather Lass (a detective with the MSP) allegedly told Brandy Zakora that they knew about the scheme involving the drug-filled basketballs, but that they had not been able to catch the perpetrator. The prisoner who gave the information to the inspectors was subsequently charged with and convicted of smuggling drugs into Lakeland, allegedly to avoid any internal investigation into the female corrections officer who was involved in the smuggling.

As alleged in the complaint, drug smuggling by corrections officers is a chronic problem throughout the Michigan state prisons. The complaint recounts two incidents from 2016 when MDOC employees reported drug smuggling by corrections officers, but no investigation was undertaken. One of the employees allegedly sent his report to the MSP, and the other emailed his concerns directly to defendant Heidi Washington, the Director of the MDOC. Both of these employees were allegedly fired, only to be reinstated after instituting litigation and a civil-service hearing, respectively.

*Id.* at 460-62.

The Court of Appeals found that the following allegations against the MSP defendants were

"insufficient to state an Eighth Amendment failure-to-protect claim." *Id.* at 468.

[T]he MSP Defendants "were involved with the drug smuggling ring and/or a cover up of Mr. Zakora's death," and [] the MSP Defendants "knew that a 'cop/officer' was the person bringing suboxone and heroin into the facility but did not investigate the allegation in determining the source of the drugs that caused Mr. Zakora's death." In addition, the complaint alleged that the MSP Defendants "knew [of] and ... participated in the drug smuggling and knew of the risks and harm associated with dangerous illegal drugs." The complaint also faulted the MSP Defendants for failing to bring a drug-detecting dog in to investigate the presence of contraband in the C-Unit before Zakora's death despite the two prior drug overdoses.

13

*Id.* at 468.  The Court found the complaint to be defective in the following ways.

> [It] failed to explain with any specificity how any of the MSP Defendants were involved in the drug-smuggling scheme or how each (or any) of them knew that a police officer was responsible for the operation. Nor did the Estate plausibly allege how any of the MSP Defendants came to obtain any knowledge about the prevalence of drugs at Lakeland, how they ignored that knowledge, or how they failed to curb the introduction, spread, and usage of drugs at Lakeland.

*Id.* "As the district court determined, virtually all of the allegations against the MSP Defendants were 'legal conclusions couched as facts.'"  *Id.* (citing *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ([A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law.")).

However, the appellate court found the allegations against the MDOC defendants to be specific enough to meet the Eighth's Amendment's objective and subjective prongs.  As for the objective prong, the complaint generally alleged that "the MDOC Defendants failed to protect Zakora from the dangers of illegal drugs by failing to "do anything to curb the introduction, spread, and usage of dangerous drugs in prison, despite their direct knowledge from prisoners snitching to them and from two previous overdoses.'"  *Id.*  at 469.  The complaint specifically alleged that drugs were "so prevalent inside Zakora's C-Unit that two other inmates in his 12-to-16-person unit had overdosed in the two days prior to Zakora's death, yet … no investigation was undertaken until after Zakora died. Only after Zakora's death did MDOC officials order a full investigation and have the MSP bring a drug dog into the C-Unit to check for drugs."  *Id.* at 470.  The Court found that "failing to investigate the presence of drugs after the first two overdoses in Zakora's C-Unit raises the inference that the risk to inmate health from those drugs was "sufficiently serious,'

such that Zakora was 'incarcerated under conditions posing a substantial risk of serious harm.'"

*Id.* at 470-71 (citing *Farmer.*)[4]

Concerning the subjective prong, the Court found that the complaint sufficiently alleged

that the MDOC defendants "had knowledge about the substantial risk of serious harm to a

particular class of persons," *id.* at 472, and that Zakora was in that class.

> The two drug overdoses in the relatively small C-Unit of Lakeland that occurred in
> the two days prior to Zakora's fatal overdose presented a sufficiently obvious risk
> to infer that the MDOC Defendants who worked within Lakeland (*i.e.*, Chrisman,
> Huntley, Hoffner, and Rurka) had knowledge of a substantial risk of harm to the
> other inmates in the C-Unit. Yet they failed to conduct a prompt investigation in an
> effort to rid the space of the drugs, thereby ignoring the risk of harm to the other
> prisoners within that space.
> .…
> In addition, the complaint alleges that Inspector Chrisman knew of such a risk to
> Zakora in particular from the uncontrolled flood of drugs into Lakeland.
> Specifically, a prisoner allegedly told Inspector Chrisman "of the drug smuggling
> ring on more than one occasion prior to Mr. Zakora's death and provided
> information to the officers with details of how the drugs were coming in and who
> was providing them," giving "step by step details of how and when drugs were
> entering the facility and ... about the individuals supplying large amounts of drugs
> to Mr. Zakora." Inspector Chrisman, in turn, allegedly relayed this information to
> his colleague, Inspector Huntley, and to his supervisors, Warden Hoffner and
> Assistant Deputy Director Rivard, all of whom likewise failed to act. The prisoner's
> detailed warning, considered in conjunction with the two prior overdoses, allows
> us to draw a "reasonable inference" that MDOC Defendants Chrisman, Huntley,
> Hoffner, Rivard, and Rurka knew of a substantial risk of harm to Zakora.

*Id.* at 472-73 (citing *Iqbal*).  That level of detail and specificity was not pled in the present case.

The allegations here are more akin to those made in *Zakora* against Director Washington

which were found to be insufficient.

The complaint alleges generally that she "had notice that corrections officers were

smuggling drugs into prisons." To support this allegation, however, the Estate offers

---

4  The Court rejected the MDOC defendants' argument that "an inmate who suffers an overdose
from drugs that he voluntarily ingested cannot establish an Eighth Amendment claim because the
'intentional and criminal decision to take the drugs' severs the causal connection between the
defendants' actions and the inmate' death" and found that "this court's Eighth Amendment
jurisprudence does not support such a broad rule."  *Id.* at 471.

only two alleged incidents from 2016 when MDOC employees at other Michigan correctional facilities reported drug smuggling by corrections officers, but where no investigations were undertaken. Director Washington was allegedly contacted directly by the whistleblower at one of these other facilities, but this does not support the inference that Director Washington was actually aware of any substantial risk of harm at Lakeland.

*Id.* at 473.

The Court "acknowledge[d] that the Estate would have no claim if this were simply a run-of-the-mill drug-overdose case." *Id.*

Instead, the Estate claims that the relevant prison officials knew of Zakora's heavy drug use, knew that two of his immediate cellmates had been hospitalized in the 48 hours prior to Zakora's death due to drug overdoses, and yet they failed to initiate a timely investigation to remove the lethal substances from that cell that would have saved Zakora's life. Because the relevant defendants allegedly knew that Zakora was at risk and ignored that risk, this is directly comparable to the suicide "deliberate-indifference" cases where this court has allowed the claim to proceed beyond the pleading stage.

*Id.* at 473-74 (citation omitted).

Next, the Court addressed the allegations that "defendants Washington, Hoffner, and Rivard failed to train and supervise Jane Doe and other prison employees to prevent the entry of illegal drugs into Lakeland and other MDOC facilities. It also alleged that these defendants failed to adequately supervise their subordinates by acquiescing in the subordinates' failure to take any remedial action to address the drug problem at Lakeland." *Id.* at 474. The Court affirmed the dismissal of the claims against Director Washing but reversed the dismissal of the claims against Hoffner and Rivard.

Defendants Washington, Hoffner, and Rivard [allegedly] failed to train and supervise Jane Doe and other prison employees to prevent the entry of illegal drugs into Lakeland and other MDOC facilities. It also alleged that these defendants failed to adequately supervise their subordinates by acquiescing in the subordinates' failure to take any remedial action to address the drug problem at Lakeland.

The Estate claims that the defendants exhibited deliberate indifference by either failing to order a prompt investigation into drug smuggling at Lakeland or by failing

16

to promulgate additional or alternative policies aimed at preventing drug smuggling altogether. With regard to Director Washington, this claim fails. As explained above, the complaint does not adequately allege that Washington knew of the drug problem at Lakeland generally or of the two prior overdoses specifically, which is not surprising considering that the overdoses occurred just two days prior to Zakora's death. There is thus no basis to infer that Washington abdicated her job responsibilities in failing to order a prompt investigation or to take any other action at Lakeland.

The Estate is thus left with the assertion that Washington knew of a drug-smuggling problem throughout MDOC facilities. But to support this, the complaint alleges only that Director Washington was aware of two accusations of officer-involved smuggling at other MDOC facilities, which is insufficient to show a substantial risk of harm to all MDOC inmates. *See D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (recognizing that a county's knowledge of only three prior instances of constitutional violations by its prosecutors could not establish notice of habitually unconstitutional conduct in support of a failure-to-train claim). Even coupled with the complaint's allegation that "anti[-]overdose drugs have been used approximately 150 times" over the past two years, the allegations are insufficient because the figure is unaccompanied by any context that would allow us to infer that the problem was so severe that Washington "must have known" that all MDOC inmates were at a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 842–43, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). The complaint therefore does not adequately allege that Washington was deliberately indifferent by failing to promulgate additional or alternative policies in MDOC facilities.

Defendants Hoffner and Rivard, however, allegedly did have knowledge of the risk of harm at Lakeland and abdicated their job responsibilities in failing to take steps to abate that risk. The complaint alleges that Warden Hoffner and MDOC Assistant Deputy Director Rivard were told by Inspectors Chrisman and Huntley about the drug-smuggling problem at Lakeland, but Hoffner and Rivard allegedly either ignored the information or instructed Chrisman and Huntley not to investigate the accusations. In either scenario, a plausible claim is stated for failure to train or supervise their subordinates.

Hoffner and Rivard, as supervisors of the inspectors at MDOC, are directly responsible for giving orders to the inspectors. Failing to order an investigation into the drug smuggling, particularly after the two overdoses inside the C-Unit on consecutive days, could be found to constitute "knowing acquiescence" to the constitutional violation of exposing the inmates in the C-Unit to a substantial risk of serious harm. *See Howard v. Knox County*, 695 F. Appx 107, 115 (6th Cir. 2017) (holding that the plaintiff stated a claim for supervisory liability against a school principal by alleging that the principal "made no efforts to investigate, report, train, or terminate" a teacher who abused students, even after receiving complaints about the teacher); *see also Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999) (concluding that a complaint alleging that a

school board "made no effort whatsoever either to investigate or to put an end" to sexual harassment by a classmate "suggests that petitioner may be able to show ... deliberate indifference on the part of the Board").

When supervisors responsible for inmate health and safety ignore known threats to those inmates, they are more than simply failing to act. In *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992), this court held that that a medical official could be held liable in his supervisory capacity for failing to respond to an inmate's medical needs because he personally ignored the inmate's complaint of not getting medication, and instead referred the complaint to the head nurse whom he knew was altering and destroying the inmate's prescriptions. The court rejected the medical official's argument that his mere "failure to act" was an insufficient basis to hold him liable for the violations of his employee because his actions in ignoring the inmate's complaint meant that he had "abandon[ed] the specific duties of his position." *Id.*

So too here. The complaint adequately alleged that Hoffner and Rivard, in the face of a known threat to inmate safety "*personally* had a job to do" in ordering an investigation into the known presence of drugs at Lakeland (and inside the C-Unit specifically), "and [they] did not do it." *Id.* (emphasis in original). This alleged failure could be found to have directly resulted in a violation of Zakora's Eighth Amendment right to be free from the substantial risk of harm. The Estate has therefore stated a claim for failure to supervise against defendants Hoffner and Rivard.

*Id.* at 476-77.

The Court found that the district court erred in granting the motion to dismiss of Johnson

and Mobley but properly granted their motion for summary judgment.

The Estate alleged that Defendants Johnson and Mobley were deliberately indifferent to Zakora's serious medical needs when they failed to check on him after a prisoner, at some point during the "night/early morning" of January 22, 2017, informed them that Zakora was "not doing well" or that "there appeared to be something wrong with him." According to the complaint, Zakora could have received lifesaving medical treatment had Johnson and Mobley timely checked on him.

*Id.* at 477. "Despite these warnings, the complaint alleges, neither Johnson nor Mobley

investigated at all. This suffices to state a claim for deliberate indifference to a serious medical

need." *Id.* (citation omitted). Therefore, it was error to grant the motion to dismiss. However,

summary judgment was appropriate in light of unrefuted affidavits "that neither Johnson nor

Mobley were made aware at any time before Zakora's death that he had, or was planning to, ingest drugs. Moreover, Mobley attested that no one ever told him to check on Zakora, and Johnson checked on Zakora 'only seconds' after another inmate first alerted him to a problem." *Id.* at 478.

Looking to the principles set out in *Zakora* for guidance, the Court finds that the allegations in the present case do not rise to the level needed to state an Eighth Amendment claim. Concerning CoreCivic, Plaintiff merely alleges that it had a policy and/or custom of chronically understaffing its facilities to save money and this understaffing led to an influx of illegal drugs which ultimately resulted in the death of the Decedent. However, she asserts no facts to connect that understaffing to the drugs that killed Decedent.[5] "A broad assertion that an unconstitutional policy exists is nothing more than a bare recitation of legal standards." *See e.g.*, *Osberry v. Slusher*, 750 F. App'x 385, 398 (6th Cir. 2018). *See also Minick v. Metro. Gov't of Nashville*, 2014 WL 3817116, at *2 (M.D. Tenn. Aug. 4, 2014) ("The court recognizes that presenting municipal liability claims is more difficult after *Twombly* and *Iqbal*, but the prevailing view within this circuit and within this district is that allegations that essentially amount to notice pleading of a municipal liability claim are insufficient."); *Morris v. City of Memphis*, 2012 WL 3727149, at *3 (W.D. Tenn. Aug. 27, 2012) ("Plaintiff's claims regarding Defendant's custom, policy, or practice concerning the misbehavior of the rank and file of its police force amount to legal conclusions unaccompanied by additional factual assertions. Thus, Plaintiff's allegations simply recite the elements of a § 1983 claim.").

---

[5] Plaintiff contends that the 2017 and 2020 audits show that WCF had staffing vacancies during those time periods. But she points to no specific time during the relevant events that WCF was allegedly understaffed, how it was understaffed, where in the facility it was understaffed, why it was understaffed, or even how much it was understaffed. Moreover, her allegations related to CoreCivil facilities in other states do not constitute evidence of a custom and practice of intentionally understaffing WCF.

Plaintiff's failure to train and failure to supervise claims fail for the same reasons that similar claims failed in *Zakora*. To state a claim based on a failure to train or supervise theory, a plaintiff must plead: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Plaintiff has pled none of those elements. At most, Plaintiff has pled that the directors and senior officers of CoreCivic knew that "inadequate training" was "rampant at the CoreCivic's facilities, and they did not make reasonable efforts to change corporate policies, supervise offending employees, or counteract the threats to inmate safety. (Amd. Cmplt. at para. 76.) "[M]ere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to make out deliberate indifference."*Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011).

As explained in *Zakora*,

Turning to the adequacy of the complaint's allegations, individual liability on a failure-to-train or supervise theory "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted). A simple failure to act, without "a showing of 'direct responsibility' for the actions of the individual officers," will not suffice to establish supervisory liability. *Hays v. Jefferson County*, 668 F.2d 869, 873-74 (6th Cir. 1982) (quoting *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 46 L.Ed.2d 561 (1976)). Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999)).

As relevant here, a supervisor may be liable if he or she "abandons the specific duties of his [or her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) (citation and internal alterations omitted). The supervisor must have abdicated his or her job responsibility, and the "*active performance* of the [supervisor's] individual job function" must have directly resulted in the constitutional injury. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original). This means that, "at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in

the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d at 242 (citation and internal quotation marks omitted). The subjective prong is the same as it is for the subordinate officers: "The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (citation omitted).

*Zakora*, 44 F.4th at 476. *Zakora* allowed the failure to train and/or supervise claims against Defendants Hoffner and Rivard to go forward because there were allegations that "Warden Hoffner and MDOC Assistant Deputy Director Rivard were told by Inspectors Chrisman and Huntley about the drug-smuggling problem at Lakeland, but Hoffner and Rivard allegedly either ignored the information or instructed Chrisman and Huntley not to investigate the accusations." *Id.*

Hoffner and Rivard, as supervisors of the inspectors at MDOC, are directly responsible for giving orders to the inspectors. Failing to order an investigation into the drug smuggling, particularly after the two overdoses inside the C-Unit on consecutive days, could be found to constitute "knowing acquiescence" to the constitutional violation of exposing the inmates in the C-Unit to a substantial risk of serious harm. *See Howard v. Knox County*, 695 F. App'x 107, 115 (6th Cir. 2017) (holding that the plaintiff stated a claim for supervisory liability against a school principal by alleging that the principal "made no efforts to investigate, report, train, or terminate" a teacher who abused students, even after receiving complaints about the teacher); *see also Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 654, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999) (concluding that a complaint alleging that a school board "made no effort whatsoever either to investigate or to put an end" to sexual harassment by a classmate "suggests that petitioner may be able to show ... deliberate indifference on the part of the Board").

*Id.* at 477. Thus, a plaintiff cannot survive a motion to dismiss a failure to train and/or supervise claim when she failed to plead any facts to support those claims, as in the present case.

Plaintiff has also failed to adequately plead liability based on a final policymaker theory. An entity may be liable under Section 1983 for actions of its authorized policymakers when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Here, Plaintiff has not pled

any facts to show (1) that any policy acted as the moving force of an alleged constitutional deprivation, or (2) that any of the alleged "policymakers" made a "deliberate choice" to understaff WCF.

As for the individual defendants, those claims also must be dismissed because she fails to make any specific factual allegations against the named individual defendants. Plaintiff states that the individual defendants had actual knowledge of illegal contraband coming into WCF, but she makes no factual allegations as to what specific information they possessed, how they obtained the information, or when they learned it. This lack of specificity is in contrast to that found in *Zakora* in which two drug overdoses occurred in a small unit in the two days prior to Zakora's fatal overdose. Furthermore, one of the individual defendants was given details about the drug smuggling ring by a prisoner prior to the death of the decedent. Those details included "how the drugs were coming in and who was providing them, … step by step details of how and when drugs were entering the facility and ... [information] about the individuals supplying large amounts of drugs to Mr. Zakora." 44 F.4th at 472-73. The individual defendant receiving the information passed this information along to a colleague and to the defendant supervisors. "The prisoner's detailed warning, considered in conjunction with the two prior overdoses, allows us to draw a 'reasonable inference' that MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka knew of a substantial risk of harm to Zakora." *Id.* at 473.

Plaintiff's allegations are more in line with those made against Director Washington in *Zakora* and found to be insufficient.

> The complaint alleges generally that she "had notice that corrections officers were smuggling drugs into prisons." To support this allegation, however, the Estate offers only two alleged incidents from 2016 when MDOC employees at other Michigan correctional facilities reported drug smuggling by corrections officers, but where no investigations were undertaken. Director Washington was allegedly contacted directly by the whistleblower at one of these other facilities, but this does not

support the inference that Director Washington was actually aware of any substantial risk of harm at Lakeland.

*Id.*   Likewise, in this case, Plaintiff's claims against the individual defendants are conclusory, and they must be dismissed under Rule 12(b)(6).

In summary, Plaintiff has failed to allege facts necessary to establish that an official policy or custom of CoreCivic was the moving force behind any alleged constitutional deprivations concerning the death of the Decedent, and CoreCivic cannot be held liable under § 1983 solely on a respondeat superior theory. Accordingly, Plaintiff's § 1983 claims against CoreCivic under the Eighth Amendment must be dismissed. Likewise, Plaintiff has failed to state a claim against the individual defendants, and the claims against them must be dismissed as well.

Plaintiff's Request for Discovery

Plaintiff asserts that Defendants added facts outside the pleadings and seeks discovery prior to the Court's ruling. In support of her request, she points to a footnote in Defendants' memorandum in which they speculated that there are a number of ways that the illicit drugs could have entered the facility.

> For example, illegal contraband could be introduced during outside visitation regardless of staffing levels. It could be introduced via mail to inmates regardless of staffing levels. It could be introduced in other ways despite staffing levels. Here, Plaintiff never alleges how the illegal contraband that ultimately killed Decedent entered WCF.

(Defs' Memo. n.2, p. 8.)   Contrary to Plaintiff's assertion, Defendants presented no facts outside the pleadings in their footnote, and the Court did not consider Defendants' speculation in making its decision on the motion to dismiss.

However, even if Defendants had presented matters outside the pleadings for the Court's consideration, Plaintiff has failed to meet the requirements of Rule 56(d) of the Federal Rules of Civil Procedure which allows the nonmovant to show "by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition," after which the court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." As explained in *Zakora*,

> So, when a nonmovant believes that it needs more time for discovery before it can respond to a motion for summary judgment, "the non-movant must file an affidavit pursuant to Fed. R. Civ. 56[(d)] that details the discovery needed, or file a motion for additional discovery." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002). "Beyond the procedural requirement of filing an affidavit, Rule 56[(d)] has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) (citation omitted).

*Zakora*, 44 F.4th at 479.

Here, Plaintiff has failed to submit an affidavit or declaration as required by Rule 56(d). Even in her unsworn response, she had not stated what discovery she needs or what facts she hopes to discover. Because she has failed to meet her burden of explaining the need for discovery, her request is denied.

<u>State Law Claims</u>

In light of the dismissal of the federal claims, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. Retaining supplemental jurisdiction over state claims that arise out of the same facts that form a basis for a federal claim is a matter of discretion with the court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, (1966); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 935 (6th Cir. 1991). The factors to be analyzed in making that determination are judicial economy, comity, convenience, and fairness to the litigants. If all federal claims are dismissed before trial, as in the present case, the balance of factors will usually point toward dismissal of the state law claims. *Carnegie-Mellon University*

*v. Cohill*, 484 U.S. 343, n.7 (1988). As explained in *Medlin v. City of Algood*, 355 F. Supp. 3d 707

(M.D. Tenn. 2019),

> With the dismissal of Medlin's federal claims against Bilbrey, the Court will not retain jurisdiction over the state law claims against that Defendant because, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" *Martinez v. City of Cleveland*, 700 F. App'x 521, 523 (6th Cir. 2017). This holds true even where, as here, federal claims remain against other defendants. Retention of state law claims, however, may be appropriate where the case has been pending for a long time, discovery has been completed, the record is voluminous, a court has spent significant time on the litigation, and there are pending motions for summary judgment. *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004).

*Medlin*, 355 F. Supp. 3d at 719 (some citations omitted).

As in *Medlin*, this case is neither old nor voluminous.  It was filed less that a year ago on

July 14, 2022, and there have only been approximately thirty docket entries thus far. No scheduling

order has been entered. The only real involvement in this case by the Court so far has been to rule

on the present motion. In light of these factors, the Court will not retain jurisdiction over the

supplemental state law claims, and those claims are dismissed without prejudice.

<u>Summary and Conclusion</u>

Because Plaintiff has failed to state a claim against Defendants under the Eighth

Amendment and the Court declines to exercise supplemental jurisdiction over Plaintiff's claims,

Defendants' motion to dismiss is **GRANTED**. The motion is granted with prejudice as to the

federal claims and without prejudice as to the state law claims.

> **IT IS SO ORDERED**.

> **s/ S. Thomas Anderson**
> S. THOMAS ANDERSON
> UNITED STATES DISTRICT JUDGE

> Date:  April 5, 2023.